JEFFREY J. LEBLANC ET AL. *v.* NEW ENGLAND
RACEWAY, LLC, ET AL.
(AC 29724)

Flynn, C. J., and DiPentima and Foti, Js.

Argued March 16—officially released August 4, 2009

*Richard J. Pascal,* for the appellants (plaintiffs).

*Matthew D. Newman,* for the appellees (defendants).

*Opinion*

DiPENTIMA, J. This contract dispute stems from an unsuccessful attempt to convert a dog racing track into

a NASCAR[1] racetrack in Plainfield. The plaintiffs, Jeffrey J. LeBlanc and Diane M. LeBlanc, appeal from the judgment of the trial court rendered in favor of the defendants, New England Raceway, LLC, and its principal, Gene Arganese. On appeal, the plaintiffs claim that the court improperly (1) shifted the burden to them to prove that the defendants approved the changes made to the contract, (2) found that by signing a dual agency agreement the parties revoked the authority of the real estate agent to bind the defendants, (3) made or failed to make various findings of fact and (4) allowed the defendants to amend their answer to the plaintiffs' complaint. We disagree with the plaintiffs and, accordingly, affirm the judgment of the trial court.[2]

The court made the following findings of fact. In 2004, the defendants began to accumulate properties in the Plainfield area to acquire land for a proposed NASCAR raceway. The defendants approached the plaintiffs regarding the sale of their home, also located in Plainfield. The plaintiffs' home had a fair market value of $295,000. On May 12, 2004, the parties entered into a purchase and sale agreement in which the defendants agreed to purchase the plaintiffs' property. The contract was presented to the plaintiffs by real estate agent Sandra Corn, who had a dual agency agreement with the plaintiffs and the defendants. At that time, the contract had been signed by Arganese and had listed a sale price of $834,750. The plaintiffs made three changes to the contract prior to signing it. First, they increased the purchase price to $894,700. This price reflected the

---

[1] The National Association for Stock Car Auto Racing, Inc., is a corporation engaged in the operation of stock car races. See *McCarthy* v. *National Association for Stock Car Auto Racing, Inc.*, 48 N.J. 539, 541, 226 A.2d 713 (1967).

[2] As the defendants conceded at oral argument, because we affirm the judgment of the court, we need not address their claim on appeal that the court improperly found that if the defendants were liable for breach of contract, Arganese also would be personally liable.

value of the property if the defendants obtained the zoning approvals necessary for building the proposed NASCAR racetrack. Corn spoke with Arganese, who approved the change over the telephone. Corn then initialed the change on the contract on Arganese's behalf. Second, the plaintiffs added the phrase, "but no later than [Dec]ember 31, 2005," to paragraph ten of the contract, which then provided that the closing would take place "within 60 days of all [zoning] approvals, *but no later than [Dec]ember 31, 2005.*" (Emphasis added.) Finally, the plaintiffs added the phrase, "whichever is earlier," to paragraph eleven of the contract, which then provided that the plaintiffs would convey marketable title "on or before the 31[st] day of Dec[ember], 2005 or within 60 days of all [zoning] approvals, *whichever is earlier.*" (Emphasis added.) Corn did not initial the last two changes, nor did she confer with Arganese regarding them.

The defendants were unable to obtain the necessary zoning approvals, and the sale did not take place. On May 10, 2006, the plaintiffs filed a four count amended complaint, alleging breach of contract and seeking specific performance. The plaintiffs also alleged that New England Raceway, LLC, is a mere shell and alter ego for Arganese and that it exists solely for his economic benefit. On October 17, 2006, the defendants filed an amended answer in which they admitted two of the plaintiffs' allegations and asserted five special defenses. The defendants claimed that because they did not obtain the necessary zoning approvals, the plaintiffs could not enforce the contract. On September 7, 2007, the defendants filed a second amended answer in which they denied all of the plaintiffs' allegations and again asserted five special defenses.

On March 4, 2008, after a court trial, the court rendered judgment in favor of the defendants. On March 17, 2008, the plaintiffs filed a motion for reconsideration

and articulation. On March 24, 2008, the plaintiffs filed this appeal. Thereafter, the trial court denied the plaintiffs' motion for reconsideration and articulation.[3]

I

The plaintiffs first claim that the court improperly shifted the burden onto them to prove that Arganese, acting for the New England Raceway, LLC, approved the changes made to the May 12, 2004 contract. The plaintiffs argue that Arganese had a duty to read the contract in its entirety and that his knowledge of the contract is imputed to the defendants.

Whether a trial court applied the correct burden of proof is a question of law that we review de novo. *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 455, 844 A.2d 836 (2004). It is well settled that the party seeking to establish the existence of an enforceable contract bears the burden of proving a meeting of the minds between the parties. *Cheverie* v. *Ashcraft & Gerel*, 65 Conn. App. 425, 439, 783 A.2d 474 (burden rests on plaintiff to prove meeting of minds to establish its version of claimed contract), cert. denied, 258 Conn. 932, 785 A.2d 228 (2001). Thus, the burden properly rested on the plaintiffs.

The plaintiffs rely on our Supreme Court's decision in *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 456 A.2d 325 (1983), in support of their proposition that if Arganese did not read the contract or ask Corn what it said, apart from the change in price, he therefore was satisfied with his knowledge of the contract's terms and is deemed to have assumed the risk of a mistake as to those terms. In particular, the plaintiffs rely on the court's recitation of the principle

---

[3] This court granted the plaintiffs' motion for review, filed on April 10, 2008, but denied the relief requested.

that "[w]here a party realizes he has only limited information upon the subject of a contract, but treats that knowledge as sufficient in making the contract he is deemed to have assumed the risk of the mistake. 1 Restatement (Second), Contracts § 154 [1981]." *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, supra, 408. A close reading of *Pacelli Bros. Transportation, Inc.*, and an understanding of the context of the quoted language, however, defeat the plaintiffs' argument.

In *Pacelli Bros. Transportation, Inc.*, the plaintiffs entered into a settlement with the defendant regarding the defendant's departure from the family business. Id., 403–406. The plaintiffs then learned that the defendant had misappropriated company funds, and they sought damages for fraud and unauthorized diversion of corporate assets. Id., 402, 406. The court concluded that the principle from the Restatement was inapplicable because the plaintiffs, who suspected the defendant of dishonesty but had no knowledge of his misappropriation of funds, were entitled to assume that the defendant was correctly maintaining the company's finances. Id., 408–409.

That principle similarly is inapplicable in the present case. The court found that Corn did not discuss the changes to the closing date with Arganese and that the plaintiffs failed to prove that Arganese approved those changes. Thus, it cannot be said that Arganese realized he had limited information regarding the subject of the contract and therefore had assumed the risk of mistake.

Accordingly, the court did not improperly shift the burden of proof regarding Arganese's approval of the contract to the plaintiffs.

## II

The plaintiffs next claim that the court improperly found that by signing a dual agency agreement, the

parties revoked the authority of Corn to bind the defendants contractually. As the defendants note in response, the court did not make a finding that the dual agency agreement revoked Corn's authority to bind the defendants. Instead, the court, relying in part on the existence of the dual agency agreement, concluded that Corn had no actual, apparent or implied authority to bind the defendants.

In its memorandum of decision, the court made the following findings: "Real estate agent Corn did not object to the proposed change in the closing date. At the time of the closing, she had a dual agency agreement and was acting for both parties, although her loyalties were clearly with the buyer." The court then concluded that "Corn had no actual authority to agree to the change in the closing date," that the plaintiffs "failed to prove that Arganese intended Corn to possess the authority to bind him to the significant change which was made in the closing date" and that "Corn, particularly in view of the dual agency agreement, had neither implied nor apparent authority to bind [the defendants]." We conclude that the court's findings are supported by the evidence in the record.

We first set forth the principles that guide our review. Our Supreme Court has stated that "[a]s a general rule, a principal may be bound to contracts executed by an agent if it is within the agent's authority to contract on behalf of that principal . . . and the authority to enter into a specified contract includes the authority to make it in the usual form and with usual terms. . . . The nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn." (Internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* 269 Conn. 613, 636, 850 A.2d 145 (2004); see *Machado* v. *Statewide Grievance Committee,* 93 Conn. App. 832, 839, 890 A.2d

622 (2006). Accordingly, we review the court's findings with regard to agency and an agent's authority under the clearly erroneous standard. *Santa Fuel, Inc.* v. *Varga*, 77 Conn. App. 474, 488–89, 823 A.2d 1249, cert. denied, 265 Conn. 907, 831 A.2d 251 (2003). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) Id., 489. As a reviewing court "[w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact." (Internal quotation marks omitted.) *Machado* v. *Statewide Grievance Committee*, supra, 839. "In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *David M. Somers & Associates, P.C.* v. *Busch*, 283 Conn. 396, 403, 927 A.2d 832 (2007).

Agency is defined as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." 1 Restatement (Third), Agency § 1.01, p. 17 (2006). Three elements are required to show the existence of an agency relationship: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the

principal will be in control of the undertaking." (Internal quotation marks omitted.) *McDermott* v. *Calvary Baptist Church*, 263 Conn. 378, 384, 819 A.2d 795 (2003); *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 673, 686 A.2d 491 (1997). Significantly, our case law provides that authority to perform services on behalf of a principal does not automatically confer either actual or apparent authority to bind a principal in other respects. *111 Whitney Avenue, Inc.* v. *Commissioner of Mental Retardation*, 70 Conn. App. 692, 703, 802 A.2d 117 (2002). In particular, "[a] principal is bound to contracts executed by an agent only if it is within the agent's authority to contract on behalf of that principal . . . ." (Internal quotation marks omitted.) Id. Authority may be actual or apparent. *Machado* v. *Statewide Grievance Committee*, supra, 93 Conn. App. 838 n.8. Implied authority is actual authority circumstantially proven. Id.; see also *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 607, 799 A.2d 1027 (2002). Here, the plaintiffs argue that the court improperly determined that Corn did not have actual, implied or apparent authority. We discuss each type of authority in turn.

An agent acts with actual authority when, "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." 1 Restatement (Third), supra, § 2.01, p. 80. Here, Arganese testified that he would negotiate the terms with the homeowners, giving Corn a parameter for any further negotiations. He explained that he talked to Corn about every contract but that he would have the final say with regard to the terms. He also described Corn's relationship with New England Raceway, LLC, more generally, stating, that as a licensed real estate agent, it was her job to

function as a real estate agent in a dual agency capacity. He testified that she was not an employee of New England Raceway, LLC, but a subcontractor because of her role in scheduling events. Significantly, Arganese testified that at no time did he give Corn the authority to bind New England Raceway, LLC, in a contract. He testified that everyone involved with the company understood that no one, except Arganese himself, had the authority to bind the company. Corn also testified that at no time did Arganese or any other manager from New England Raceway, LLC, give her permission to sign contracts on the defendants' behalf.

As the arbiter of credibility, the court was entitled to credit this testimony of Arganese and Corn. See *Somers* v. *Chan*, 110 Conn. App. 511, 530, 955 A.2d 667 (2008). Thus, there was evidence that Arganese did not grant Corn authority to enter into contracts on behalf of New England Raceway, LLC, and that Corn understood she did not have the authority to do so. It follows that we cannot conclude that the court improperly determined that Corn did not have actual authority to bind the defendants contractually.

We next consider whether Corn had implied authority to bind the defendants to the contract with the plaintiffs. Our Supreme Court has defined implied authority as "actual authority circumstantially proved. It is the authority which the principal intended his agent to possess. . . . Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent." (Internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 850, 817 A.2d 683 (2003); *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 70, 699 A.2d 101 (1997). In addition to testifying that he did not give Corn authority to enter into contracts on his behalf, Arganese also testified regarding his practice with Corn in delivering and executing

the sales contracts. He testified that he and Corn would draw up a contract, which Corn would present to the seller. If the seller made changes to which Arganese agreed, he would initial the changes, and the parties would have a contract. If the seller made changes to the contract to which Arganese did not agree, he would counter with another offer. Similarly, Corn testified that when the seller made a change to the contract, it was her practice to have the seller initial the change and then bring the contract to Arganese for his approval. She then would mail the approved contract back to the seller. This evidence would not support inferences from which the court could deduce that Arganese manifested his consent to Corn's entering into a contract on his behalf. Compare *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, supra, 260 Conn. 608–609 (agent had implied authority to bind plaintiff to agreement when agent directly communicated with plaintiff's board of directors regarding negotiations of agreement, agent was designated as point person for all communications, agent stated he had authority to execute agreement and plaintiff's instructions to agent to refrain from signing agreement evidenced plaintiff's belief that agent's signature would bind plaintiff). Given this factual background, we cannot conclude that the court improperly determined that Corn did not have implied authority to bind the defendants.

Finally, we consider whether Corn had apparent authority to bind the defendants to a contract with the plaintiffs. "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The

issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action. . . . *Tomlinson* v. *Board of Education*, 226 Conn. 704, 734–35, 629 A.2d 333 (1993)." (Internal quotation marks omitted.) *Machado* v. *Statewide Grievance Committee*, supra, 93 Conn. App. 838–39 n.8; see *Gordon* v. *Tobias*, supra, 262 Conn. 850–51. Whether apparent authority exists is a question of fact, requiring the trier of fact to evaluate the parties' conduct in light of the attenuating circumstances. *111 Whitney Avenue, Inc.* v. *Commissioner of Mental Retardation*, supra, 70 Conn. App. 704. "Only in the clearest of circumstances, where no other conclusion could reasonably be reached, is the trier's determination of fact to be disturbed." (Internal quotation marks omitted.) Id.

Jeffrey LeBlanc testified that Corn was the real estate agent who first spoke with him regarding the sale of his property at a meeting held by the defendants. He testified that on May 12, 2005, he told Corn that she could bring the contract to him but that he intended on further negotiating the purchase price. He stated that Arganese already had signed the contract. Jeffrey LeBlanc testified that after he and Corn negotiated a higher sale price, Corn "told me she [did not] have the authority to change the price, so that's when [Arganese] came into place. . . . And he gave the authority to change the price issue." Jeffrey LeBlanc testified that he remembered hearing Arganese's voice on the other end of the telephone during Corn's telephone call and

remembered when Arganese agreed on the change in price "because that was one of the reasons why we had to have him on the phone, so we all agreed on what the new price would be." He testified that, following the telephone call, Corn reported that Arganese had agreed to the price change and that Corn was authorized to make that change. He also testified that he did not hear discussion between Corn and Arganese regarding the changes to the closing date, even though the changes were made prior to Corn's telephone call to Arganese.

Jeffrey LeBlanc also testified that on May 12, 2005, he signed Corn's dual agency agreement. He stated that Corn had explained that he needed to sign the agreement because she was working for both parties to the contract.

Jeffrey LeBlanc's testimony regarding the necessity of calling Arganese to approve the change in price defeats the plaintiffs' argument that Corn had apparent authority to agree to the changes regarding the closing date. His testimony indicated that he understood Corn's authority to be limited and that she was required to obtain Arganese's approval prior to initialing changes to the contract. Thus, there was evidence that the plaintiffs reasonably could not have believed that Corn had the necessary authority to bind the defendants. Compare *Gordon* v. *Tobias*, supra, 262 Conn. 851 (mortgage loan brokerage corporation had apparent authority to act as agent for mortgage holder to collect payments from borrowers when mortgage holder received payments for more than two years from brokerage corporation, did not request full payment, demanded that brokerage corporation invoke higher interest rate, and previously had used brokerage corporation to arrange payment, collect payment and obtain mortgage releases) and *Host America Corp.* v. *Ramsey*, 107 Conn. App. 849, 857–59, 947 A.2d 957 (defendants justified in believing agent,

founder and then chief executive officer of plaintiff, had apparent authority to bind plaintiff where agent previously had signed similar agreements without prior or subsequent approval of plaintiff's board of directors and agreement prepared by plaintiff's attorneys had signature line for agent on behalf of plaintiff), cert. denied, 289 Conn. 904, 957 A.2d 870 (2008). We conclude that the court properly determined that Corn did not have apparent authority to approve the change to the closing date.

## III

We now address the bulk of the plaintiffs' claims on appeal, which challenge the factual findings of the court.[4] We conclude that these claims are without merit.

Our resolution of the plaintiffs' claims is governed by familiar principles of appellate review. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 237, 963 A.2d 943 (2009).

---

[4] The plaintiffs raise a total of nine claims on appeal, six of which concern the factual findings of the court. This court often has noted that such a multiplicity of issues can foreclose the appellant's opportunity to provide a fully reasoned discussion of the pivotal issues on appeal. See *Testone* v. *C. R. Gibson Co.*, 114 Conn. App. 210, 214 n.5, 969 A.2d 179, cert. denied, 292 Conn. 914, 973 A.2d 663 (2009). As our Supreme Court has observed: "Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue . . . . Jackson, Advocacy Before the United States Supreme Court, 25 Temple L. Q. 115, 119 (1951)]; *Jones* v. *Barnes*, 463 U.S. 745, 752, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983)." (Internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 117 n.3, 622 A.2d 519 (1993).

A

The plaintiffs claim that the court improperly found that all of the defendants' contracts with other property owners for the purchase of similar properties contained a contingency requiring " 'all [zoning] approvals prior to closing' . . . ." The plaintiffs argue that because there is a lack of uniformity in other contracts as to zoning approvals, the court's finding was improper. Specifically, the plaintiffs note that other contracts contain varying references to the contingency clause regarding zoning approvals and that at least two of the contracts did not contain a clause making zoning approvals a prerequisite to the closing. The defendants respond that if the court improperly used the word "all" instead of "many," such error is harmless. We agree with the defendants that even if the court's finding was clearly erroneous, it was harmless.

"Where . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, 78 Conn. App. 493, 507, 827 A.2d 729 (2003); see also *New Haven* v. *Tuchmann*, 93 Conn. App. 787, 795, 890 A.2d 664, cert. denied, 278 Conn. 903, 896 A.2d 104 (2006). In our view, this finding does not undermine the court's fact-finding process, particularly in light of the evidence that the majority of the contracts did contain language regarding zoning approvals as a prerequisite to closing. Specifically, of the fifty-two additional contracts admitted into evidence, forty-nine contain a contingency clause regarding site approvals. Moreover, even if we assume that this factual determination was incorrect, we are not persuaded that this finding formed

the basis of the court's judgment and fail to see how such an improper finding was not harmless. See *Doody* v. *Doody*, 99 Conn. App. 512, 518, 914 A.2d 1058 (2007).

B

The plaintiffs also claim that the court improperly failed to find that the defendants had accepted the contract when Arganese congratulated the plaintiffs on May 12, 2005. In its memorandum of decision, the court found: "The plaintiffs introduced disputed testimony that Arganese congratulated the plaintiffs on the sale at a lounge later in the evening following the signing of the contract. While the court believes the plaintiffs' testimony in this regard, the plaintiffs have failed to prove that Arganese knew of the changes to the closing date even if he did congratulate them." The plaintiffs claim that the court also should have found that "Arganese's conduct in congratulating the [plaintiffs] constituted an assent to the terms of the May 12, 2005 [contract]." The plaintiffs essentially argue that because Corn was acting as the defendants' agent, Arganese is presumed to share her knowledge of the additional terms of the contract and therefore is bound by them. Thus, the plaintiffs argue that even if the parties did not enter into a binding contract when the plaintiffs signed the contract, the parties became bound when Arganese congratulated the plaintiffs. We disagree.

As we concluded in part II, the court properly determined that Corn did not have actual, implied or apparent authority to enter into a contract on the defendants' behalf. Because Corn did not have the authority to bind the defendants in the contract, her knowledge of the added terms is not imputed to Arganese. Compare *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 540–41 n.15, 893 A.2d 389 (2006) (acts and knowledge of agent acting within scope of agency imputed to principal) and 1

Restatement (Third), supra, § 5.03, p. 359 ("[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal").

Accordingly, we conclude that the court properly declined to find that Arganese accepted the terms of the contract when he congratulated the plaintiffs. "To be enforceable, an agreement must be definite and certain as to its terms and requirements. . . . Whether and on what terms a contractual commitment has been undertaken are ultimately questions of fact for the trier of facts. . . . A fact finder's determination of whether a contract existed must be based on all of the evidence. Furthermore, [t]o form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . Because the . . . claim involves a finding of fact, we must adhere to the long-standing principle that findings of fact are ordinarily left undisturbed upon judicial review." (Citation omitted; internal quotation marks omitted.) *Original Grasso Construction Co.* v. *Shepherd,* 70 Conn. App. 404, 410–11, 799 A.2d 1083, cert. denied, 261 Conn. 932, 806 A.2d 1065 (2002).

The court heard evidence that Corn did not discuss the changes to the closing date with Arganese on May 12, 2005. In addition, Arganese testified that when he received the contract from Corn with the changes to the closing date, he told her he would not agree to it because all sales had to be subject to the zoning approvals. As the sole arbiter of credibility, the court was "free to accept or reject, in whole or in part, the testimony

offered by either party." (Internal quotation marks omitted.) *Somers* v. *Chan*, supra, 110 Conn. App. 530. Thus, the evidence provides ample support for the court's finding that Arganese did not know of the changes to the terms of the contract when he congratulated the plaintiffs on May 12, 2005. See *Cavallo* v. *Lewis*, 1 Conn. App. 519, 521, 473 A.2d 338 (1984) (no contract formed when plaintiffs' alteration to real estate agreement, which extended closing date, terminated their power of acceptance and functioned as counteroffer).

C

The plaintiffs next claim that the court improperly failed to find that Corn's September 19, 2005 letter was evidence of an acceptance of the contract by the defendants or a failure by the defendants to exercise an opportunity to cancel the contract.

The letter, dated September 19, 2005, and signed by Corn, was printed on William Raveis stationery.[5] The plaintiffs received the letter in an envelope bearing the return address of "New England Raceway." The letter stated that Corn would organize an informational meeting with the homeowners as soon as she received an update on the proposed development. The letter closed with the following: "New England Raceway does still intend to bring this much needed economic development to Plainfield." Whether a contract exists is a question of fact for the court. See *Baron* v. *Culver & Associates, LLC*, 106 Conn. App. 600, 601, 942 A.2d 552 (2008). Moreover, "[i]t is the quintessential function of the fact finder to reject or accept certain evidence . . . ." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 489, 940 A.2d 733 (2008). It therefore was within the court's discretion to decline to find that the letter was evidence of the defendants'

---

[5] Corn testified that in 2005 she was self-employed with the William Raveis real estate company as a real estate agent.

acceptance of the contract or of their failure to exercise an opportunity to cancel the contract.

## D

The plaintiffs also claim that the court improperly failed to find that the defendants accepted the terms of the contract when they did not seek further negotiations. The plaintiffs reason that if the defendants did not believe that they had a contract, they would have sought further negotiations. We are not convinced.

"As an appellate tribunal, this court may not retry a case. . . . The factfinding function is vested in the trial court with its unique opportunity to view the evidence . . . including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us. Appellate review of a factual finding, therefore, is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court." (Internal quotation marks omitted.) *Somers* v. *Chan*, supra, 110 Conn. App. 530. With this well established principle of appellate review in mind, we conclude that the court properly rejected the plaintiffs' contention that the defendants accepted the terms of the contract when they did not seek further negotiations.

## E

Next, the plaintiffs claim that the court's judgment in favor of the defendants should be reversed because it was contrary to evidence that the defendants' attorney reported that the parties had entered into a contract.

The plaintiffs submitted a letter, dated May 20, 2005, addressed to the plaintiffs and signed by Harry B. Heller, an attorney for the defendants. The letter stated that Heller had been advised that the plaintiffs had entered into a contract with the defendants for the sale of their

property. The letter further stated that this sale was contingent on various zoning approvals and went on to summarize the status of the defendants' applications for those zoning approvals. The court heard testimony from both Arganese and Heller that the letter was a generic one.[6] More specifically, Heller testified that he had sent the letter to all of the sellers of property to update them on the status of the zoning proceedings and the procedure that needed to be completed successfully before closings could occur. Heller testified that he had no other contact or correspondence with the plaintiffs.

As an appellate court, we are entitled to presume that the trial court acted properly and considered all of the evidence. *Doe* v. *Rapoport*, 80 Conn. App. 111, 116, 833 A.2d 926 (2003); see *Martin* v. *Martin*, 101 Conn. App. 106, 116 n.4, 920 A.2d 340 (2007). "[Our role] is not to duplicate the trial court's weighing process, but rather to determine whether its conclusion was reasonable." (Internal quotation marks omitted.) *Doe* v. *Rapoport*, supra, 116. On the basis of our review of the evidence regarding Heller's letter, we cannot conclude that the court improperly declined to find that the letter was definitive evidence of a contract between the defendants and the plaintiffs.

## F

The plaintiffs next claim that the court improperly found that the plaintiffs' changes to paragraphs ten and eleven of the contract regarding the timing of the closing " 'were totally inconsistent with [the defendants'] property acquisition plan' . . . ."[7] In support of this claim, the plaintiffs appear to argue that it would be unfair to place a homeowner under a contract contingent on

---

[6] A videotape of the deposition of Heller, taken on July 20, 2007, was played at trial.

[7] Although this finding is contained within that portion of the court's memorandum of decision regarding conclusions of law, it is clearly a factual finding.

zoning approvals that would take years to obtain. Rather than focusing on the evidence regarding the defendants' property acquisition plan, the plaintiffs suggest that the defendants had other reasons to purchase the property regardless of whether they obtained the zoning approvals. We find these arguments unpersuasive.

Here, the court found that "[t]he changes [to the closing date] requested by the plaintiffs and forwarded to Arganese by Corn were totally inconsistent with New England Raceway's property acquisition plan." Although the court did not set it out in its findings of fact, it heard testimony from Arganese that all of the contracts were subject to the zoning approvals. In addition, Corn testified that although each contract had a different closing date, each contract contained a contingency regarding the zoning approvals. The court, as the sole arbiter of credibility, was free to accept this testimony. *Sakon* v. *Glastonbury*, 111 Conn. App. 242, 252, 958 A.2d 801 (2008), cert. denied, 290 Conn. 916, 965 A.2d 554 (2009). This finding also is supported by the fact that forty-nine of the fifty-two additional contracts admitted into evidence contained a contingency regarding site approvals. Therefore, we conclude that the court's finding that the plaintiffs' changes to the closing date were inconsistent with the defendants' property acquisition plan was not clearly erroneous.

IV

The plaintiffs' final claim is that the court improperly allowed the defendants to amend their answer to the plaintiffs' complaint. Because the plaintiffs failed to preserve this claim at trial, we decline to review it on appeal.

In their amended complaint, the plaintiffs alleged in paragraph one that on May 12, 2005, the plaintiffs and the defendants entered into a written agreement in

which the defendants agreed to buy the plaintiffs' residential property in Plainfield. In paragraph two, the plaintiffs alleged that by the terms of the written agreement, the defendants agreed to purchase the property on or before December 31, 2005. The defendants' amended answer and special defenses to the amended complaint, filed October 20, 2006, admitted the allegations in paragraphs one and two. Trial commenced on September 6, 2007. On September 7, 2007, the defendants filed an amended answer and special defenses to the amended complaint in which they denied the allegations in paragraphs one and two. On the record the same day, the defendants' counsel stated that he understood that the court had received his amended answer. The court indicated that it had. The plaintiffs' counsel stated that he had not seen the amended answer but that the defendants' counsel had informed him of its contents and that it changed some admissions to denials. The defendants' counsel then stated: "The first two paragraphs are now denied . . . . So, instead of admitting there's a contract, he now denies that there was a contract." The court then inquired of the plaintiffs' counsel: "Do you have a problem with it?" The plaintiffs' counsel responded: "I would highlight this, Your Honor: He has admitted it. . . . But I [do not] want to be on the record as saying I approve of the change at this late date." The court then authorized the filing of the amended answer.

"We have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial and *was ruled upon and decided by the court adversely to the appellant's claim.*" (Emphasis in original; internal quotation marks omitted.) *In re Emerald C.*, 108 Conn. App. 839, 852 n.9, 949 A.2d 1266, cert. denied, 289 Conn. 923, 958 A.2d 150 (2008); see Practice Book § 60-5 (court not bound

to consider claim unless "distinctly raised at the trial"). Here, the plaintiffs failed to object to the amended answer. Thus, the claim was not distinctly raised, and there was no ruling by the court. Therefore, we decline to consider this claim on appeal.

The judgment is affirmed.

In this opinion the other judges concurred.